1

2

3

4

5                  **UNITED STATES DISTRICT COURT**

6                  **EASTERN DISTRICT OF CALIFORNIA**

7

8   ARMANDO OLVERA**,**                         CASE NO. 1:11-CV-00540 AWI-GSA

9                        Plaintiff,

10          v.                                  ORDER RE MOTION FOR SUMMARY
                                                JUDGMENT
11  CITY OF MODESTO, a municipal
    corporation, and MARK ULRICH,
12                                              (Doc. 23)
                         Defendants.
13

14

15

16                           **I. BACKGROUND**

17          On January 11, 2011, Plaintiff Armando Olvera, filed a complaint in state court against

18  seven named defendants; Modesto Police Department officers Bradley Beavers, Brian Keiber,

19  Randy Raduechel, Sgt. Timothy Helton, the Modesto Police Department, the City of Modesto

20  ("the City") and Mark Ulrich ("Ulrich").  Plaintiff brought ten claims; two claims under Title 42

21  U.S.C. section 1983 for constitutional violations; a claim under Article 1, section 13 of the

22  California Constitution; a claim under section 52.1 of the California Civil Code; claims for

23  battery, assault with a deadly weapon, assault, and false arrest; and a claim under California Civil

24  Code Section 3342 for liability for dog bite damages; and a claim for negligence.

25          On March 31, 2011, the case was removed to the Eastern District of California, Fresno

26  Division.  Discovery ensued.

27          On January 25, 2013, Plaintiff's claims against defendants Bradley Beavers, Brian Keiber,

28  Randy Raduechel and Sgt. Timothy Helton were dismissed by stipulation.  Plaintiff's cause of

1    action under Title 42 U.S.C. section 1983 against City of Modesto was dismissed.  Plaintiff's

2    cause of action under California Civil Code section 52.1 was also dismissed, as was Plaintiff's

3    sixth cause of action for "assault by means of force likely to produce great bodily injury."

4         On March 8, 2013, Defendants filed a motion for summary judgment.  Defendants contend

5    that there is no triable issue of material fact and that the moving parties are entitled to judgment as

6    a matter of law because the seizure of Plaintiff's person was a lawful detention and arrest, the

7    entry into and search of the abandoned building where Plaintiff was found was reasonable under

8    the circumstances, the force used on the plaintiff's person by the defendants was reasonable under

9    the circumstances, and that Plaintiff's state tort claims fail for the same reasons.[1]

## II. LEGAL STANDARD

11        "A party may move for summary judgment, identifying each claim or defense – or the part

12   of each claim or defense – on which summary judgment is sought.  The court shall grant summary

13   judgment if the movant shows that there is no genuine dispute as to any material fact and the

14   movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears

15   the initial burden of "informing the district court of the basis for its motion, and identifying those

16   portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together

17   with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

18   material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265

19   (1986); see Fed. R. Civ. P. 56(c)(1)(A); see also Miller v. Glenn Miller Productions, Inc., 454 F.3d

20   975, 987 (9th Cir. 2006).  A fact is material if it could affect the outcome of the suit under the

21   governing substantive law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

22   Miller, 454 F.3d at 987.

23        "Where the non-moving party bears the burden of proof at trial, the moving party need

24   only prove that there is an absence of evidence to support the non-moving party's case."  In re

---

[1] Defendants make one brief reference to qualified immunity in their notice of Motion for Summary Judgment. However, nowhere else do Defendants raise or argue the issue of qualified immunity.  "[S]uch a 'boilerplate' reference, particularly given the absence of any legal argument as to why any of the individual defendants were entitled to qualified immunity in the event that a constitutional violation occurred, is not adequate to preserve qualified immunity."  Pullano v. No. 8170, CCDC Guard, 2:10-CV-00335-MMD, 2013 WL 1758999, n. 1 (D. Nev. Apr. 24, 2013).

1   Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex, 447 U.S. at

2   324).  If the moving party meets its initial burden, the burden shifts to the non-moving party to

3   present evidence establishing the existence of a genuine dispute as to any material fact.  See

4   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89

5   L.Ed.2d 538 (1986); see also Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210

6   F.3d 1099, 1103 (9th Cir. 2000); Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th

7   Cir. 2008).  A court ruling on a motion for summary judgment must construe all facts and

8   inferences in the light most favorable to the non-moving party.  See Anderson, 477 U.S. at 255.  If

9   the dispute is genuine, i.e. the opposing party has demonstrated that the evidence is such that a

10  reasonable jury could return a verdict for the nonmoving party, summary judgment shall not be

11  granted.  See Anderson, 477 U.S. at 248-49; In re Caneva, 550 F.3d 755, 761 (9th Cir. 2008);

12  Lindsey v. SLT Los Angeles, LLC, 447 F.3d 1138, 1144 (9th Cir. 2006).  The opposing party

13  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

14  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

15  versions of the truth at trial."  First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 290

16  (1968);  Giles v. General Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).

17          Additionally, the court has the discretion in appropriate circumstances to consider

18  materials that are not properly brought to its attention, but the court is not required to examine the

19  entire file for evidence establishing a genuine issue of material fact where the evidence is not set

20  forth in the opposing papers with adequate references.  See Southern Cal. Gas Co. v. City of Santa

21  Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d

22  1026, 1031 (9th Cir. 2001).

23                                    **III. FACTS**[2]

24          At approximately 4:17 a.m. on December 4, 2009, Modesto Police Department Officers

25  Natalie Niles and Christopher Adams were dispatched to 315 J Street, Modesto, California on a

26  reported "family fight" call in which a suspect named Mario had reportedly "pulled a knife".  As

27

28  [2] These facts are considered undisputed only for the purposes of deciding this motion for summary judgment.

Officer Niles arrived on the scene, she was advised that the suspect was in the back yard.  Officer Niles saw a man in a black leather jacket fall to the ground near the front gate of 315 J Street, and she yelled at him, identifying herself as a Modesto Police Officer, and ordering him to show his hands.  Rather than comply, the man got to his feet and ran toward the back of the house.

As Officer Adams was dispatched to the scene, he heard Dispatch broadcast that the suspect was dressed in a black leather jacket, black pants, and black boots.  At the scene, Officer Adams heard a broadcast stating that the suspect was possibly running westbound toward Washington Street.  Officer Adams got back in his patrol car and saw a male fitting the suspect's description running westbound on the North side of Pine Street.  Officer Adams lost sight of the suspect mid-block on the North side of Pine Street, West of Washington Street.  Officer Adams took up a position to begin the establishment of a perimeter to contain the suspect, and called for additional units to assist in that effort.  Officer Niles also lost sight of the man, and, as fellow officers were responding to set up a perimeter and search for the suspect, Officer Niles made contact with the reporting party on the call, Kelley Jones, who told Niles that Mario was a wanted "parolee-at-large" and had a prior conviction involving the possession of dangerous weapons.  Niles broadcasted this information to the officers setting up the perimeter, and Dispatch broadcast the same information.

Officer Mark Ulrich and his K-9 partner, Stryker, were summoned to the scene to assist in the search for the suspect, who had been identified as Mario Zephier.  A search team led by Officer Ulrich and Stryker, and including Sergeant Timothy Helton and Officers Bradley Beavers and Brian Kleiber, was formed to search for Zephier.  Because Officer Adams had last seen Zephier in the vicinity of 110 Pine Street and because Officer Ulrich had found a black leather jacket lying just inside a gap in the fence surrounding the property on 110 Pine Street, a search was commenced on that property.  The property at 110 Pine Street consisted of six buildings, which were apparently vacant and boarded up.

Officer Ulrich gave a standard K-9 announcement and then sent Stryker to search the common outdoor areas surrounding the buildings before searching inside the buildings.  As Stryker did not locate the suspect in the outdoor areas, Ulrich elected to search the interior of

4

structures on the property whose condition allowed for entry from the outside.  Prior to ordering

Stryker to enter each such structure, Ulrich states in his declaration that he gave the K-9

Announcement several times.  No one was located in the three structures on the east side of the

property, which the search team dealt with first.  The search team led by Ulrich and Stryker then

approached the fourth structure's entrance.  The parties dispute whether this structure had a door.

From a position outside the doorway, Ulrich saw an open room immediately inside, a room to the

right in the rear that had a piece of plywood lying across the doorway blocking the view into that

room and another room to the left into which he had an unobstructed view.  Just inside the

doorway to the room on the left, Ulrich could see what appeared to be a mattress lying on the floor

with a maroon sleeping bag on top of it.  It appeared to Ulrich that there was a person underneath

the sleeping bag.  Ulrich gave the K-9 announcement to the person underneath the sleeping bag

and received no response.

Ulrich then sent Stryker into the structure to search.  Stryker is trained to "find and alert",

meaning he will bark and/or show excitement if he locates a human while he is searching.  When

Stryker was sent into the structure, he went directly to the mattress and sleeping bag and alerted.

He then nudged the sleeping bag with his nose.  The person under the bag moved.  Ulrich called

Stryker back to him and then made statements to the person under the bag, beginning with "You

underneath the sleeping bag . . ."  Because Ulrich believed the person in the sleeping bag was the

suspect, and the suspect was an armed parolee-at-large who would fight a police officer

apprehending him, Ulrich ordered Stryker to bite and hold the person under the sleeping bag until

ordered to release. Stryker did so, biting Plaintiff first on the foot and then on the arm when

Plaintiff sat up and extended his arm toward the dog.

Officers then approached Plaintiff and gained control of him.  Ulrich conducted a "tactical

out," hit Stryker on the head with a flashlight and manually disengaged Stryker from Plaintiff,

who was then handcuffed by other officers.  The parties dispute whether further force was used on

Plaintiff's person.  The officers then learned that the person seized was Plaintiff, Armando Olvera.

Plaintiff told the officers that he had not heard any of the commands or other noises prior to being

bitten by the dog because he had been asleep.  Plaintiff offers evidence that he told the officers he

1   had the deed to the house and that the owner, Octavio Ramirez, had given him permission to be

2   there.  Defendants contend that Plaintiff told officers that the owner was staying on the property,

3   but officers did not find him there. Plaintiff states he did not tell the officers that the owner lived

4   on the property.

5        At the time of the incident, the property was owned by Deutsche Bank National Trust Co.

6   Octavio Ramirez was a former owner of the property.

7        Because Stryker had been deployed to "bite and hold" Plaintiff, Ulrich was required to stop

8   searching for the suspect Mario Zephier and attend to other duties related to "post-bite" care and

9   the completion of necessary K-9 deployment reports.

10       Plaintiff was arrested for trespassing on the 110 Pine Street location and for resisting,

11  obstructing or delaying a peace officer in the performance of his duty.

12                              **IV. SECTION 1983**

13       Plaintiff brings claims for violations of his constitutional rights under Title 42 United

14  States Code section 1893 against Defendant Mark Ulrich.  Plaintiff contends that Ulrich's invasion

15  into his sleeping quarters and use of unreasonable and excessive force constituted an unlawful

16  search and seizure in violation of Plaintiff's Fourth Amendment rights.  Plaintiff further contends

17  that as a result of these violations, he was falsely arrested.

18       Section 1983 provides, in pertinent part: "Every person who, under color of any statute,

19  ordinance, regulation, custom or usage, of any State […] subjects, or causes to be subjected, any

20  citizen of the United States or other person within the jurisdiction thereof to the deprivation of any

21  rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

22  injured in an action at law […] for redress."  42 U.S.C. § 1983.

23       "To succeed on a section 1983 claim, a plaintiff must show that (1) the conduct

24  complained of was committed by a person acting under color of state law; and (2) the conduct

25  deprived the plaintiff of a federal constitutional or statutory right."  Patel v. Kent School Dist., 648

26  F.3d 965, 971 (9th Cir. 2011) (citing Tatum v. City and County of San Francisco, 441 F.3d 1090,

27  1094 (9th Cir. 2006)).

28                        **V.    FOURTEENTH AMENDMENT CLAIM**

Plaintiff's Complaint alleges a violation of Plaintiff's Fourteenth Amendment rights. However, Plaintiff does not elaborate on what Fourteenth Amendment violation occurred. Defendants contend in their Motion for Summary Judgment that the Fourteenth Amendment does not apply to Plaintiff's Constitutional claims.  Plaintiff does not dispute this in his opposition. Plaintiff's claims concern excessive force and unlawful search and seizure.  Thus, Fourth Amendment standards, as applicable to the states through the Fourteenth Amendment must be applied.  Summary judgment on Plaintiff's freestanding Fourteenth Amendment claim is granted in favor of Defendants.

## VI.    FOURTH AMENDMENT CLAIMS

Defendants contend that Olvera has failed to raise genuine issues of material fact as to whether Defendant Ulrich infringed upon Plaintiff's Fourth Amendment rights.  Defendants contend that Plaintiff had no reasonable expectation of privacy in the building where he was sleeping, and, in any event, the exigent circumstances exception to the Fourth Amendment warrant requirement permitted Ulrich to enter the building without a warrant.  Defendants further contend that the force Ulrich used was objectively reasonable under the Fourth Amendment given the totality of the circumstances. Finally, Defendants contend that Plaintiff's arrest did not violate the Fourth Amendment because Ulrich had probable cause to arrest Plaintiff for trespassing and resisting, obstructing or delaying a peace officer in the performance of his duty.

### 1.  **Warrantless Entry**

A person has Fourth Amendment privacy rights only in those areas and in those items where he or she has "an expectation of privacy that society is prepared to consider reasonable." O'Connor v. Ortega, 480 U.S. 709, 715, 107 S. Ct. 1492, 94 L. Ed. 2d 714 (1987). If the government's conduct does not violate a person's reasonable expectation of privacy, then it does not constitute a Fourth Amendment search. Illinois v. Andreas, 463 U.S. 765, 771, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983). Accordingly, no warrant is required. The Supreme Court has enunciated a two-part test to determine whether an expectation of privacy is reasonable and legitimate. Katz v. United States, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). First, the individual must have a manifested subjective expectation of privacy, and second, society must

7

recognize that expectation as objectively reasonable. California v. Greenwood, 486 U.S. 35, 39, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988); O'Connor v. Ortega, 480 at 715; Katz v. United States, 389 U.S. at 361.

In this case, Plaintiff states that he believed he had an expectation of privacy in the Structure because he had consent from the owner to stay there and that expectation was manifested by his action of setting a board against the door to exclude others. Plaintiff's Opposition, 18:12-16. A reasonable jury could find that Plaintiff exhibited a subjective expectation of privacy in the building. Thus, the Court will turn to the issue of whether Plaintiff's subjective expectation of privacy was objectively reasonable.

### a. Squatters

An overnight guest has a legitimate expectation of privacy in the host's home because the host willingly shares his house and his privacy with his guest. Minnesota v. Olson, 495 U.S. 91, 96-97, 99, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990). In contrast, a squatter lacks standing to contest a search of the structure in which he or she is squatting, regardless of the squatters subjective belief. Zimmerman v. Bishop Estate, 25 F.3d 784, 787-88 (9th Cir. 1994). Society is not prepared to recognize as reasonable the expectation of privacy of an individual who unlawfully occupies a piece of property. United States v. Cortez-Dutrieville, 743 F.3d 881, 884 (3d Cir. 2014); see also Lavan v. City of Los Angeles, 693 F.3d 1022, 1036 (9th Cir. 2012); Zimmerman v. Bishop Estate, 25 F.3d 784, 787 (9th Cir. 1994); United States v. Ruckman, 806 F.2d 1471, 1472 (10th Cir. 1986).

Circuit courts have found that an individual without a legal right to be in a residence does not have an expectation of privacy in it, even if he mistakenly believed that his presence was not wrongful. For example, in Zimmerman, the Ninth Circuit found that the guest who had consent to be in the residence by squatters had no greater right than the squatters themselves, and the guest did not have an expectation of privacy in the residenceres. Zimmerman, 25 F.3d at 787-78. Similarly, the Sixth Circuit found that a consensual visitor of a squatter in a dilapidated, uninhabitable house did not have an objectively reasonable expectation of privacy in the house. United States v. Whitehead, 415 F.3d 583, 588 (6th Cir. 2005). The Third Circuit found an

1  individual who was an overnight guest with the consent of the owner did not have an expectation

2  of privacy in the home because a protection order prohibited him from entering the home, and the

3  consent did not override the terms of the protection order. Cortez-Dutrieville, 743 F.3d at 884. The

4  Seventh Circuit found that an individual that had been evicted from his home two weeks prior and

5  given notice of the same did not have a legitimate expectation of privacy in the residence. United

6  States v. Curlin, 638 F.3d 562, 565 (7th Cir. 2011).

7         In all of these cases, the courts found that an individual did not have an objectively

8  reasonable expectation of privacy in a residence in which he had a mistaken subjective expectation

9  of privacy because he did not have the legal right to be in the home in fact. One district court has

10  stated: "To hold that someone has an expectation of privacy based solely on their belief that the

11  person who gave him consent to be there had authority to do so would truncate the objectively

12  reasonable element from the expectation of privacy test." United States v. Murray, 2010 U.S. Dist.

13  LEXIS 77954, *25, n.14 (D.V.I. August 2, 2010).

14         Here, the undisputed facts show that Plaintiff did not have a legal right to be in the

15  building. The facts of this case are very similar to Zimmerman, in which the Ninth Circuit found

16  that a squatter's overnight guest did not have an expectation of privacy in a shack on the property.

17  The evidence showed that the squatters were aware that they did not have a legal right to occupy

18  the premises –they were told they were trespassing and told to vacate- but the evidence did not

19  show that the guest was aware of their or his lack of legal right to be there. Zimmerman, 25 F.3d at

20  786, 787. The guest presented evidence that the squatters should have had an expectation of

21  privacy because of the length of their residency, their improvements to the property, and the

22  perceived acquiescence of their presence by the actual owners. Id. at 787. Even though the guest

23  had consent from one with apparent authority to give consent, and may have had a reasonable

24  subjective belief that he was an overnight guest of someone with a reasonable expectation of

25  privacy, the Ninth Circuit found that he "had no greater right to be on the property than did the

26  [squatters]," whose length of residency and improvements to the property did not give rise to an

27  objectively reasonable expectation of privacy. Id. at 788. Considering Zimmerman with Cortez-

28  Dutrieville, the Court finds that staying as an overnight guest by someone without actual authority

1  to give consent does not create a reasonably objective expectation of privacy for the guest.

2        Here, Plaintiff provides evidence that he believed he had permission to be in the building

3  by Octavio Ramirez, a previous owner. Plaintiff's Opposition 18:12-14. However, Octavio

4  Ramirez was unable to give consent to Plaintiff to be in the building on December 4, 2009 because

5  he was not the legal owner at that time and had no legal right to be present in the building. <u>See</u>

6  Undisputed Fact 49. Consent from Octavio Ramirez does not create an expectation of privacy for

7  Plaintiff because he did not have actual authority to give consent. Further, the evidence

8  demonstrates the six buildings, including the building at issue, were gutted and in substandard

9  condition, and, with the exception of Plaintiff, uninhabited. Undisputed Facts 20, 27, 50. Plaintiff

10  did not have an objective reason to believe that Octavio Ramirez had the authority to give consent.

11        Plaintiff may have had a subjective belief that he had an expectation of privacy in the

12  building, but his belief was not objectively reasonable. The building had been in an uninhabitable

13  state at least since it was deemed "substandard" on April 22, 2009, and the state of the buildings

14  was apparently abandoned. Undisputed Facts 20, 50. The person from whom he received consent

15  also had no actual authority to do so because he had no legal right to occupy the building, and, as

16  such, Octavio Ramirez did not have a privacy interest in the building to share with Plaintiff. <u>See</u>

17  Undisputed Fact 49. Hence, Plaintiff's presence in the building was unlawful, and such unlawful

18  presence did not give him an objectively reasonable expectation of privacy in it. Defendants' entry

19  into the building, therefore, did not violate Plaintiff's Fourth Amendment rights.

20        **b.  Abandoned Property**

21        In addition, Defendants' entry into the building did not violate Plaintiff's Fourth

22  Amendment rights because Ulrich had an objectively reasonable belief that the building was

23  abandoned. Abandoned property is not subject to Fourth Amendment protection. <u>United States v.</u>

24  <u>Wilson</u>, 472 F.2d 901, 902 (9th Cir. 1972); <u>United States v. Harrison</u>, 689 F.3d 301, 306-307 (3d

25  Cir. 2012); <u>McKenney v. Harrison,</u> 635 F.3d 354, 358 (8th Cir. 2011); <u>see also</u> <u>Michigan v. Tyler</u>,

26  436 U.S. 499, 503, 505, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978); <u>Abel v. United States</u>, 362 U.S.

27  217, 241 (1960). "Search or seizure of abandoned property, even without a warrant, is simply not

28  unreasonable." <u>United States v. Wilson</u>, 472 F.2d at 902.

A police officer's warrantless entry into a house that *appears* to be abandoned, but is not actually abandoned, does not violate the Fourth Amendment when they act on an objectively reasonable mistake of fact. McKenney, 635 F.3d at 358-59, Harrison, 689 F.3d at 309; United States v. Sledge, 650 F.2d 1075, 1080 (9th Cir. 1981).[3] This is distinct from the officer's entitlement to qualified immunity. McKenney, at 358.

Objective reasonableness of an officer's belief that a house is abandoned is based on the totality of the circumstances. McKenney, 635 F.3d at 359. Courts have found that a poorly maintained exterior of a house is insufficient to find that an officer's belief that the house is abandoned is reasonable (there is no "trashy house" exception to the warrant requirement); but there must be further observations, such as corroboration that the house's interior matched the exterior. Harrison, 689 F.3d at 311.

A person's presence in the house does not affect the reasonable belief that a house is abandoned. See McKenney, 635 F.3d at 359. "Because a reasonable officer could have concluded that the house was abandoned, a reasonable officer could also have concluded that anyone in the house was a trespasser who had no privacy interest under the Fourth Amendment." Id. In United States. v Knepper, an officer reasonably relied on the appearance of abandonment in conducting a warrantless search of a cottage.  United States v. Knepper, 256 Fed. Appx. 982, 984 (9th Cir. 2007). He relied in part on the former landlord's credible account that the suspect had vacated the premises, even though an individual was in the cottage and had shut and locked the door as the officer approached. Id.

The facts supporting a finding that the officers had an objectively reasonable belief that a house was abandoned in McKenney v. Harrison were that the house had an unkempt yard and fence, there were no vehicles parked in the driveway, there was no response when the officers knocked, the back door was open, the kitchen was viewable through the open door and the cabinets and refrigerator were open and empty, there was no furniture or personal effects, and

---

[3] It is worth noting that the Sixth Circuit has recently found that certain dilapidated properties may be considered an "open field" not subject to Fourth Amendment protection. United States v. Mathis, 738 F.3d 719, 731 (6th Cir. 2013). An unused factory site "consisting of a partially demolished building and debris strewn throughout a paved lot" was "undeveloped (as one might reasonably understand 'undeveloped' in an urban setting)" and qualified as an open field. Id. at 731.

there were no lights on or any other indication that there was electrical power. McKenney, 635

F.3d at 359. In United States v. Harrison, the court reached the same conclusion based on the facts

that there was trash strewn about the exterior of the house, the lawn was overgrown, the windows

were boarded or exposed, the front door was open, and one officer had made prior entries over

several months and observed squatters who claimed no right to be there, and that there were no

furnishings, electricity, or plumbing. Harrison, 689 F.3d at 309, 312.

In United States v. Johnson, which discusses McKenney v. Harrison and United States v.

Harrison, the district court of Nevada found that the officers did not have an objectively

reasonable belief that the property was abandoned because their observations of a dark dilapidated

building, without testimony that any officer had gone into the property, only gave rise to a

suspicion that the property was abandoned. United States v. Johnson, 2012 U.S. Dist. LEXIS

186865, *44-46 (D. Nev. Dec. 26, 2012).

The facts in this case are analogous to those in McKenney v. Harrison and United States v.

Harrison. Defendant Ulrich observed a building complex consisting of six buildings, many of

which lacked doors and window glass, and the buildings appeared to have been gutted.

Undisputed Fact 20. Officer Ulrich first had Stryker search outside the buildings, giving the "K-9

announcement" without any response. Undisputed Fact 23. Stryker did not locate any people

outside of the buildings, and Officer Ulrich began to search the interior of the buildings, giving the

K-9 announcement before entering each building and waiting some time to allow anyone inside to

reveal himself. Undisputed Facts 25-26. These facts alone may not be sufficient to find that

Ulrich's belief that the building was abandoned was objectively reasonable; however, Ulrich

found by entering and searching that the first three buildings were abandoned. Undisputed Fact 27.

Ulrich had not been in the specific building in question on a previous occasion, as in United States

v. Harrison, but the condition of the interior of the first three buildings raises a strong presumption

that the interior or the remaining three were also in an abandoned state. In fact, the property was

owned by a bank, it had been declared substandard, and there was no electricity, heat, or plumbing

in any of the buildings. Undisputed Facts 21, 49, 50.

Plaintiff has attached to his brief deposition testimony that corroborates the condition of

the building. Plaintiff had to use a wooden board to secure the door and that it was very cold so he went to sleep wearing several layers, including two jackets and boots. Plaintiff's Opposition 1:10, 1:21-22. He states that he did not hear or respond to any of Ulrich's announcements or demands because he was asleep. Undisputed Fact 44. He states that Ulrich observed some personal items in each of the buildings and that Ulrich saw a person that turned out to be Plaintiff sleeping on a mattress when he shined a flashlight into the building. Plaintiff's Opposition 3:19-22.  However, those contentions do not contradict a finding that the interior of the buildings objectively appeared abandoned.

Here, the totality of the circumstances suggests that it was objectively reasonable to believe that the fourth building Ulrich entered, and in which Plaintiff was sleeping, was abandoned. As previously stated, the exterior of the buildings were dilapidated, lacking windows and doors, and the interior appeared to be gutted, there was no response to the officer's announcement, and three adjacent buildings in the same structure were abandoned. Whether Plaintiff was sleeping in the building, and whether or not Ulrich had observed Plaintiff when he shined a flashlight into the window, does not change his objectively reasonable belief that the building was abandoned. The building's exterior and interior appeared to be abandoned, and the actual abandoned state of the three other buildings in the same complex gave rise to a strong presumption that the fourth was also abandoned. A reasonable jury could not find that Ulrich's mistake of fact that the building was abandoned was objectively unreasonable.

Hence, Plaintiff did not have an objectively reasonable expectation of privacy in an apparently abandoned building, and there is no genuine dispute that Defendants entry into the building was not a violation of the Fourth Amendment.

Because Plaintiff had no legal right to be in the building and because the building was apparently abandoned, Plaintiff did not have an objectively reasonable expectation of privacy in the building. Therefore Plaintiff did not have Fourth Amendment rights in the building, and the warrantless entry into the building did not constitute a Fourth Amendment search. Defendants' motion will be granted to the extent that it is based on the warrantless entry.

**2.  Excessive Force**

"If the evidence, reviewed in the light most favorable to [Plaintiff], could support a finding of excessive force, then the defendants are not entitled to summary judgment." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005).  Defendants contend that Ulrich's use of force in deploying Stryker to bite Plaintiff was objectively reasonable given the totality of the circumstances Ulrich faced, and argue that summary judgment must be granted in their favor on Plaintiff's excessive force claim. Plaintiff contends that a reasonable jury could find that Defendant Ulrich's use of force contravened the Fourth Amendment because, in applying the relevant factors, a jury could conclude Ulrich's use of force was unnecessary and therefore unjustified.

In excessive force cases, "the extent of the intrusion on the individual's Fourth Amendment rights" must be balanced "against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances." Espinosa, 598 F.3d at 537; see also Graham v. Connor, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); Price v. Sery, 513 F.3d 962, 968 (9th Cir. 2008); Miller v. Clark County, 340 F.3d 959, 964 (9th Cir. 2003).  This analysis has three steps, explained by the Ninth Circuit as the following:

> "First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.' . . . Next, we must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape . . . Third, 'we balance the gravity of the intrusion on the individual against the government's need for that intrusion.' . . . Ultimately, we must balance the force that was used by the officers against the need for such force to determine whether the force used was 'greater than is reasonable under the circumstances.'"

Espinosa, 598 F.3d at 537.

### a.  The Severity of the Intrusion

"When the governmental interests at stake are substantial, a greater intrusion upon the Fourth Amendment rights of the person may be justified.  Conversely, when the governmental interest is insubstantial, the application of even minimal force may be unreasonable." Nelson v. City of Davis, 685 F.3d 867, 878 (9th Cir. 2012).  Where both the risk of harm and actual harm are significant, the harm must be justified by substantial government interests. Id. at 879.

The parties agree that when Stryker bit Plaintiff, substantial force was used.  Stryker bit Plaintiff twice, in the foot and in the arm.  Plaintiff required medical attention.  Plaintiff sustained scarring and post-traumatic nerve injury.  See Plaintiff's Exhibit H, Statement of Dr. Robert A. Forester.  Ulrich testified that he was aware that a police dog is capable of inflicting great bodily injury and even death.  See Plaintiff's Exhibit B, Testimony of Mark Ulrich.  Based on the undisputed facts, the Court finds the intrusion into Plaintiff's Fourth Amendment right was a substantial one.  See Miller, 340 F.3d at 964.  Therefore, the government interest at stake must be substantial to justify the use of substantial force.

### b.  Governmental Interests

Defendants contend that Ulrich reasonably thought that Plaintiff was the suspect Mario Zephier when Stryker was sent to "bite and hold".  Therefore, Defendants conclude that the governmental interest at stake here was suspect Mario Zephier's capture, and this constituted a substantial governmental interest.  Plaintiff contends that Ulrich's belief that Plaintiff was Mario Zephier was unreasonable, and therefore, the governmental interest here was not substantial.  Plaintiff also argues that the governmental interest was minor because Plaintiff was arrested for only minor offenses (trespassing and resisting, obstructing, or delaying a peace officer).  If Ulrich's belief was reasonable, then the governmental interest here would be a substantial one, possibly justifying the use of substantial force.  See Hill v. California, 401 U.S. 797, 804, 91 S. Ct. 1106, 1111, 28 L. Ed. 2d 484 (1971) (holding that officers' reasonable mistake as to a suspect's identity entitled the officers to do what the law would have allowed had the correct suspect been arrested, i.e. perform a search incident to arrest).

### i.  Factual Issues

***Whether the Property was Secured:*** Plaintiff contends that upon arriving at the scene, Ulrich did not have any information indicating that the 110 Pine Street property had been secured and therefore, for all Ulrich knew, Zephier had left the area.  The undisputed facts show that a search perimeter was being set up to include 110 Pine Street.  See Undisputed Facts 10 and 11.  It is undisputed that the property at 110 Pine Street consisted of several buildings.  See Undisputed Fact 20.  However, nothing in the undisputed facts demonstrates that Ulrich knew that the search

perimeter or the property had been secured or that Ulrich believed Zephier was in the specific building where Plaintiff was found.  Therefore, the Court cannot conclude that that Ulrich knew Zephier was within the search perimeter, the property, or the building. [4]

***Pursuit and Jacket:*** The undisputed facts show that Ulrich and the other Modesto Police Department officers were in pursuit of a suspect whom they had lost sight of in the vicinity of 110 Pine Street.  <u>See</u> Undisputed Facts 8-11.  Further, a jacket matching the description of one worn by the suspect Zephier was found in a gap in the fence around 110 Pine Street.  <u>See</u> Undisputed Fact 19.  Upon entering the building, Ulrich could not see Plaintiff or what he was wearing to make further identification.  <u>See</u> Undisputed Fact 30.

***Failure to Respond to Commands:*** Plaintiff did not respond to any of Ulrich's K-9 announcements.  <u>See</u> Undisputed Fact 30.  Plaintiff contends that he did not hear the K-9 announcements because he was asleep.  Defendants contend that Ulrich was reasonable in believing that Plaintiff was Zephier because Plaintiff was found within the search parameters underneath a sleeping bag and did not respond to the K-9 announcements.

***Failure to Make Further Efforts to Identify:*** Plaintiff also contends that Ulrich did not act reasonably because he did nothing to ascertain whether the person under the sleeping bag was Zephier. For example, he did not ask the person to identify themselves, nor observe the person's eyes.  None of the undisputed facts show that Ulrich made any efforts to ascertain whether the person under the sleeping bag was in fact Zephier.

### ii.    Similar Cases

Case law on similar issues does not conclusively demonstrate that Ulrich's beliefs and actions were reasonable.  In <u>Tarantino v. Dupnik</u>, a sleeping homeless man was bitten by a sheriff department K-9 dog. 2012 WL 1718893, *3 (D. Ariz. May 15, 2012).  In <u>Tarantino</u>, the dog was being used to seek a felony suspect who had fled into the desert.  <u>See</u> <u>Id</u>. at *4.  The court granted the defendant deputy's motion for summary judgment, finding that the Ninth Circuit factors

---

[4] Defendants point to the fact that a black jacket was found inside the fence gap of 110 Pine Street. However, this does not demonstrate that Defendants believed or would have been reasonable in believing that Zephier was in the one specific building where Plaintiff was found.  At most, they have shown there was a one in six chance that Zephier was in a building. This draws parallels to the aforementioned <u>Winsor</u> case.  <u>See</u> 846 F.2d 1569.

favored the objective reasonableness of the officer's decision to release the dog.  See Id. at *5.
The court considered the fact that officers attempted less forceful means of apprehension before
releasing the dog (searching on foot, using helicopters to search the scene, and making several
loud announcements).  See Id.  The court also found that the officer had no reason to believe that
anyone other than the suspect would be in the desert search area. See Id.  Several factors
distinguish Tarantino from the case before the court.  In Tarantino, officers did not have the
"suspect" cornered because they were searching in the open desert. Here, the officers had
identified a finite search area.  In addition, there is no evidence that Ulrich attempted less forceful
means of apprehension before releasing the dog, other than calling out to him. Nothing before the
court shows that Ulrich reasonably believed that no one other than the suspect would be within the
search area.[5]

  In Chew v. Gates, a suspect fled from the police and was bitten by a police dog in a
shipping yard where he had hidden.  27 F.3d 1436, 1436 (9th Cir. 1994).  The court found that
Chew did not pose an immediate threat to officers because nothing suggested that he engaged in
any threatening behavior during the time he was hiding, "or that he did anything other than hide
quietly." Id. at 1442.  The court found that in light of these facts, a rational jury could easily find
that Chew posed no immediate safety threat to anyone.  The court found that the other two Ninth
Circuit factors weighed slightly in favor of the defendants.  See Chew, 27 F.3d at 1442.  In regard
to the severity of the crime at issue, the court found that the significance of three prior outstanding
felony warrants was diminished "by the facts that Chew was completely surrounded by the police,
and that the prospects for his imminent capture were far greater than are those of the many fleeing
suspects who are fleeter than the police officers chasing them." Id. at 1443.  Chew is similar to
this action.  Here, Defendants have shown nothing to suggest that Plaintiff posed an immediate
threat when he was found within the building on 110 Pine Street.  As in Chew, the prospect of the
imminent capture of the person under the sleeping bag was great.

  In Kopf v. Wing, armed robbery suspects fled from police officers, hid in a backyard shed

---

[5] In fact, prior to the search of 110 Pine Street Officer Randy Raduechel encountered a black male within the search
perimeter whom he ascertained was not the suspect.  See Plaintiff's Exhibit E.

1   of a house in a residential neighborhood, and ultimately bitten by a police dog.  See Kopf v. Wing,

2   942 F.2d 265, 266 (4th Cir. 1991).  In Kopf, as here, the issuance of loud K-9 warnings was

3   contested.  Id. at 268.  The Fourth Circuit found it significant that "[n]either [suspect] nor any

4   civilian witness heard the announcement; only police officers testified that it was given."  Id.  In

5   addition, the plaintiff submitted expert affidavits stating that the use of police dogs on surrounded

6   suspects was unreasonable with or without a warning.  Id.  The Fourth Circuit found that these

7   issues precluded granting summary judgment for defendant police officers.  Id. at 269.

8        In McKay v. City of Hayward, a man was bitten by a K-9 dog that police were using to

9   track a burglary suspect.  See McKay v. City of Hayward, 12-CV-01613 NC, 2013 WL 2605782

10   *1 (N.D. Cal. June 11, 2013).  The court found that while the governmental interests in securing

11   the safety of the community by apprehending an armed individual who had fled and whose

12   whereabouts were unknown was strong, other facts came into play when the officer and K-9 dog

13   pursued the suspect into the Plaintiff's backyard.  Id. at *7.  The officer did not give a warning and

14   released the dog in a residential area.  Id.  The court found that because testimony called into

15   question the reasonableness of this decision, the task of determining whether the officer's decision

16   was reasonable under the circumstances was for a jury.  See McKay, 2013 WL 2605782 at *7.

17        In Fallis v. Sasaki, officers were attempting to locate a fleeing suspect who had possibly

18   hidden within a perimeter established by the officers.  See 2011 WL 111724 *9 (W.D. Wash. Jan.

19   13, 2011).  The officers did not know where and if the suspect was hiding.  See Id.  The search

20   took place at night and "the facts known to these officers did not suggest that the officers had a

21   way to determine whether [the suspect] was armed or posed other threats to their individual safety

22   or those of the residents who lived in the area where [the suspect] had fled."  Id.  A police K-9 dog

23   was released and bit the suspect.  Id. at 11.  The court found that a rational jury could not conclude

24   that the officer's use of the dog was unreasonable and therefore constituted excessive force.  Id. at

25   *11.  However, in Fallis, the person bitten was not inside a structure, but outside while hiding in

26   bushes.  Id. at *3.

27        **iii.    Expert Declaration**

28        Plaintiff has offered the declaration of a K-9 expert, Vanness H. Bogardus III, who

18

concludes that "when Officer Ulrich permitted his dog to bite Mr. Olvera, he did not see or develop a factual basis to believe that Mr. Olvera was the subject he was seeking, Mr. Zephier, or that he was armed with anything."  Plaintiff's Exhibit J, p.7.  Further, Bogardus states that "the situation begged for further investigation, to rule Mr. Olvera in or out as the reportedly armed and dangerous domestic violence parolee-at-large." Plaintiff's Exhibit J, p.8.  Bogardus states that Ulrich should have used other methods to arrest Plaintiff and that "the releasing of the police dog to effect Mr. Olvera's arrest was unreasonable, unnecessary, and excessive force".  See Plaintiff's Exhibit J, p.15.  In his declaration, Bogardus states that standard K-9 practice holds that even if a handler is operating under the belief that a suspect is armed, the dog will not be released.  Instead, additional back-up should be called.  See Plaintiff's Exhibit J, p.11.  Bogardus also states that California POST Standards "require that an officer (or another) be under physical assault in order to exercise a canine attack as a force option." Id. at 14.  Finally, he states that "[a]ssuming no immediate risk to life, Officers are supposed to take the additional few minutes sometimes required to wake up *or* persuade persons to comply with the officers' commands." Id.

Bogardus's expert declaration is the type of testimony the Ninth Circuit in Smith v. City of Hemet found to create a disputed issue of fact requiring a jury to assess the reasonableness of force used.  See 394 F.3d 689, 703 (9th Cir. 2005).  Considering this expert testimony, this case's facts, the severity and extent of force used, and the decisions of other courts in regard to similar incidents, the Court finds that, as in Smith, "it is evident that the question whether the force used here was reasonable is a matter that cannot be resolved in favor of the defendants on summary judgment." Smith, 394 F.3d at 703 (9th Cir. 2005).

Further, even if Ulrich's belief as to Plaintiff's identity was objectively reasonable, Bogardus' declaration calls into question the reasonableness of using a police dog in such a situation.  In Chew and Smith, the Ninth Circuit held that an additional factor to be considered under Graham is the "availability of alternative methods of capturing or subduing a suspect." Smith, 394 F.3d at 703; Chew, 27 F.3d at 1441 n. 5.  In Smith, the plaintiff presented an expert declaration concluding that officers could and should have used other methods to complete the arrest rather than to "sic the police dog" on the suspect.  394 F.3d at 703.  The Ninth Circuit found

that "a rational jury could rely upon such evidence in assessing whether the officers' use of force was unreasonable." Id. (internal citations omitted).  Considering the availability of other means with the three Ninth Circuit factors, the court held that "it is evident that the question whether the force used here was reasonable is a matter that cannot be resolved in favor of the defendants on summary judgment." Smith, 394 F.3d at 703.

### c.   Whether Ulrich was Objectively Reasonable

On a motion for summary judgment, Defendants must provide evidence to show that Ulrich's decision was objectively reasonable given the facts he knew at the time.  Defendants have not met this burden.  Ulrich did not have sufficient information to believe that Plaintiff was the suspect. Plaintiff demonstrated no threatening actions to the officers. Ulrich did not attempt to wake Plaintiff or cause him to reveal himself other than calling out to him. Ulrich did not attempt less invasive means to apprehend him. Given the facts, Plaintiff's expert's declaration, and the case law, a reasonable jury could find in Plaintiff's favor that Ulrich's decision was not objectively reasonable in such a situation.  Summary judgment cannot be granted to Defendants on the issue of excessive force.

### 3.  False Arrest

Defendants contend that Plaintiff's false arrest claim fails because probable cause existed to arrest Plaintiff for trespassing and for resisting, obstructing, or delaying Officer Ulrich. Plaintiff contends that Ulrich did not have probable cause and, therefore, Ulrich's arrest of Plaintiff violated the Fourth Amendment.

A warrantless arrest must be justified by probable cause, which requires the officers to have knowledge or reasonably trustworthy information sufficient to warrant a prudent person in believing that the suspect has committed a crime or is committing a crime, based on the totality of the circumstances known to the officers at the time. United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007); Rohde v. City of Roseburg, 137 F.3d 1142, 1144 (9th Cir. 1998); Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964). A plaintiff must show there was no probable cause in order to prevail on a section 1983 claim for false arrest. Cabrera v. City of Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998).

### a. Trespassing Under California Penal Code 602(m)

Ulrich arrested Plaintiff for trespassing.  Defendants contend that Plaintiff told Ulrich he had the permission of the person living in the property's front to sleep in the building where Plaintiff was found.  Ulrich then went to inspect the front building and found it "gutted, uninhabitable and abandoned."  See Defendant's Statement of Undisputed Material Facts.  Plaintiff contends that he never told Ulrich that he had the permission of a person living in the front building to sleep there.  Plaintiff has attached exhibits from Plaintiff's deposition in which Plaintiff testifies that he told Ulrich that he had permission to be in the building, had the deed to the property in his pocket, and that the owner had given him permission to stay in the building in exchange for helping him remodel the house.  See Plaintiff's Exhibit A.  Plaintiff also has submitted a statement to the Court asserting that he never told Ulrich that the owner of the property lived in the front structure of the property.

For the purposes of this motion for summary judgment, the Court must accept Plaintiff's version of the disputed facts as true.  Here, there is a genuine dispute of material fact as to what Plaintiff told Ulrich about his permission to be on the property.  A reasonable jury, believing Plaintiff, could find that Ulrich did not have probable cause to arrest Plaintiff for trespassing.  Therefore, the Court does not grant summary judgment to Defendants on the issue of false arrest in relation to the trespassing charge.

### b. Resisting, Obstructing, or Delaying a Peace Officer under California Penal Code Section 148(a)

Ulrich arrested Plaintiff for resisting, delaying, or obstructing a peace officer under California Penal Code Section 148(a).  Section 148(a) states:

> Every person who *willfully* resists, delays, or obstructs any public officer [or] peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

Cal. Penal Code § 148 (West) (emphasis added).

Defendants contend that Officer Ulrich had probable cause to arrest Plaintiff for violating Section 148 because Modesto Police officers had to divert time and attention away from the search

1  for Mario Zephier in order to "gain control over the recalcitrant Mr. Olvera" and because Ulrich

2  had to stop searching for Zephier to attend to "post-bite" care for Plaintiff and complete the

3  necessary K-9 deployment reports.  Defendants contend that though Plaintiff did not run from

4  officers, he concealed himself beneath the sleeping bag as officers attempted to gain control of

5  him.  Defendants contend that these facts show sufficient probable cause to grant Defendants'

6  motion for summary judgment on the issue of false arrest.

7       In support of their position, Defendants cite to People v. Allen, in which a suspect ran and

8  hid from an officer, thereby delaying the officer in the performance of his duty.  109 Cal. App. 3d

9  981 (1980).  However here, Plaintiff did not run and hide under the sleeping bag to avoid police.

10  The parties do not dispute that Plaintiff was beneath the sleeping bag when Officer Ulrich entered

11  the structure and remained beneath the bag until Stryker bit Plaintiff and officers gained control of

12  him.  Even without considering the disputed facts as to whether Plaintiff was awake and concealed

13  beneath the sleeping bag or merely sleeping in the sleeping bag, Defendants have not provided

14  facts sufficient to show that Ulrich had probable cause to believe that Plaintiff *willfully* resisted,

15  delayed, or obstructed Ulrich and other Modesto Police Department officers by remaining under

16  the sleeping bag.

17       "An outright refusal to cooperate with police officers cannot create adequate grounds for

18  an intrusion which would otherwise be unjustifiable."  People v. Bower, 24 Cal. 3d 638, 649, 597

19  P.2d 115, 122 (1979).  Here, Plaintiff contends that he was asleep and Defendants have failed to

20  show that there is no genuine dispute of material fact on whether Ulrich had probable cause to

21  arrest Plaintiff for a violation of section 148.  In addition, as noted above, there is a genuine issue

22  of fact as to whether Ulrich had probable cause to arrest Plaintiff for trespassing based on the

23  undisputed facts.  Therefore, the Court must deny Defendants' motion for summary judgment on

24  the claim of false arrest.

25                    **VII.    STATE LAW CLAIMS**

26  **1.  California Constitutional Law Claim**

27       Defendants contend that because the Fourth Amendment standard of reasonableness

28  applies to Plaintiff's claims under Article I, § 13 of the California Constitution, summary

1  judgment should be granted to Defendants.  Plaintiff's claim under Article I, § 13 alleges that

2  Defendants' use of unreasonable and/or excessive force violated Plaintiff's California

3  Constitutional rights.  Plaintiff contends that broader protection is afforded to citizens under

4  Article I, § 13 than under the Fourth Amendment and a different standard applies to Plaintiff's

5  California Constitutional law claim.

6       "The touchstone for all issues under the Fourth Amendment and [A]rticle I, [§] 13 of the

7  California Constitution is reasonableness. [Citations.]" People v. Boulter, 199 Cal. App. 4th 761,

8  768, 131 Cal. Rptr. 3d 185, 190 (2011), review denied (Dec. 21, 2011) (citing Ingersoll v. Palmer,

9  43 Cal.3d at 1329, 241 Cal.Rptr. 42, 743 P.2d 1299); see also Sanchez v. Cnty. of San Diego, 464

10  F.3d 916, 928-29 (9th Cir. 2006).  "This language indicates that the right to be free from

11  unreasonable searches under Art[icle] I § 13 of the California Constitution parallels the Fourth

12  Amendment inquiry into the reasonableness of a search." Sanchez, 464 F.3d at 928-29.

13  Defendants are correct in asserting that the Fourth Amendment standard of reasonableness applies

14  to Plaintiff's California constitutional law claims.  However, as discussed above, Defendants are

15  not entitled to summary judgment on Plaintiff's Fourth Amendment excessive force and false

16  arrest claims.  Thus, summary judgment on Plaintiff's California constitutional law claims based

17  on the same arguments is not appropriate.

18  **2.  <u>Assault</u>**

19       Defendants contend that Plaintiff's claim of assault fails for lack of proof of a necessary

20  element of assault.  The essential elements of a cause of action for assault are:

21    "(1) defendant acted with intent to cause harmful or offensive contact, or threatened to
     touch plaintiff in a harmful or offensive manner; (2) plaintiff reasonably believed she was

22       about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff
     that defendant was about to carry out the threat; (3) plaintiff did not consent to defendant's

23       conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial factor in

24       causing plaintiff's harm."

25   Yun Hee So v. Sook Ja Shin, 212 Cal. App. 4th 652, 668-69, 151 Cal. Rptr. 3d 257, 269 (2013),

26  as modified on denial of reh'g (Jan. 28, 2013) (citing CACI No. 1301; Plotnik v. Meihaus (2012)

27  208 Cal.App.4th 1590, 1603–1604, 146 Cal.Rptr.3d 585)).  Defendants contend that plaintiff was

28  unaware of any impending harmful or offensive touching because he was asleep and unaware of a

1  police presence in the building[6] until after any harmful touching commenced, and that therefore

2  his claim fails the essential elements of an assault cause of action.  Plaintiff contends that because

3  he was awake between the first and second dog bite, he was aware and anticipated harm from

4  Stryker's second bite.  Defendant further contends that even if Plaintiff can establish the elements

5  of assault, Ulrich is immune from liability because he was acting reasonably in his performance of

6  duty when he chose to have Stryker bite Plaintiff.

7  The undisputed facts show that Plaintiff was bitten twice and was awake when he was

8  bitten a second time.  Therefore, Plaintiff was aware of impending harmful or offensive touching

9  from Stryker between the first and second time he was bitten. Plaintiff's claim for assault does not

10  fail for lack of one of the elements.

11  **3.  Battery**

12  Defendants contend that Plaintiff's state law battery claim fails because the reasonableness

13  standard for a claim of state law battery by a peace officer is the same as the Fourth Amendment

14  reasonableness standard for excessive force claims.  Defendants are correct that the reasonableness

15  standard applies to both claims.  See Yount v. City of Sacramento 43 Cal. 4th 885, 902, 183 P.3d

16  471, 484 (2008) (common law battery claim, like section 1983 claim, requires proof of

17  unreasonable force by officer); see also Rodriguez v. City of Modesto, CV F 10-1370 LJO MJS,

18  2011 WL 2224765, *9 (E.D. Cal. June 7, 2011).  However, as stated above, Defendants have

19  failed to show that Plaintiff's excessive force claim fails because the force was reasonable.

20  Therefore, summary judgment on Plaintiff's state law claim for battery fails for the same reasons.

21  Defendants are not entitled to summary judgment on Plaintiff's battery claim.

22  **4.  Negligence**

23  Defendants contend that no reasonable juror could find that Ulrich acted unreasonably in

24  releasing Stryker. Plaintiff's claim for negligence flows "from the same facts as the alleged Fourth

25  Amendment violation for excessive force and are measured by the same reasonableness standard

26  of the Fourth Amendment."  Abston v. City of Merced, 2011 WL 2118517, *16 (E.D. Cal. May

27

28  _____

[6] This position is in contrast with Defendant's argument that Plaintiff was aware of the officers and was intentionally hiding from them.

24, 2011) aff'd, 506 F. App'x 650 (9th Cir. 2013) (citing Munoz v. City of Union City, 120 Cal.App.4th 1077, 1102 n. 6, 16 Cal.Rptr.3d 521 (2004). Therefore Defendants' motion for summary judgment on Plaintiff's negligence claim fails for the same reason as does their motion on Plaintiff's federal constitutional claims; the evidence taken in the light most favorable to Plaintiff does not show that Defendant Ulrich acted reasonably.

**5. False Arrest**

As noted above, the Court finds that summary judgment cannot be granted to Defendants on the Fourth Amendment false arrest claim. Given that Defendants make no new contentions regarding Plaintiff's false arrest tort claim and offer no additional evidence, the Court cannot grant summary judgment for Defendants on the state law false arrest claim.

**6. Cal. Civ. Code Section 3342**

Defendants contend that Plaintiff's claim under California Civil Code section 3342 fails because subsection (b) of section 3342 applies in this instance and provides Defendants with immunity. Section 3342(a) sets forth strict liability for dog bites. Section 3342(b) provides an exception to this strict liability.

> Nothing in this section shall authorize the bringing of an action pursuant to subdivision (a) against any governmental agency using a dog in military or police work if the bite or bites occurred while the dog was defending itself from an annoying, harassing, or provoking act, or assisting an employee of the agency in any of the following: (1) In the apprehension or holding of a suspect where the employee has a reasonable suspicion of the suspect's involvement in criminal activity.

Cal. Civ. Code § 3342 (West). Section 3342(d) provides that "[s]ubdivision (b) shall apply only where a governmental agency using a dog in military or police work has adopted a written policy on the necessary and appropriate use of a dog for the police or military work enumerated in subdivision (b)." Id.

It is undisputed that Stryker was a dog used in police work. Ulrich attaches to his declaration the Modesto Police Department "Guidelines for Canine Unit Operations," which has the stated purpose of "establish[ing] policies and procedures for the authorized use of Modesto Police Department Canine Teams." Ulrich Decl., Exh. H, p.1. Plaintiff objects on the basis that Ulrich is not an authorized representative to testify on behalf of the Modesto Police Department

1    and the document lacks the proper foundation. Plaintiff's Objections, 9:14-17. However, Plaintiff

2    does not dispute that such document exists.

3          Because Plaintiff has not disputed the existence of the document and its contained policy

4    regarding the use of police dogs, but only is concerned with the document's foundation, the Court

5    finds, for the purposes of this motion only, that Ulrich, as an employee subject to the policy on the

6    necessary and appropriate use of Modesto Police Department dog, has sufficient authority to

7    authenticate the document in order to support the conclusion that such document exists.[7] Taking

8    the facts most favorable to the Plaintiff, no reasonable jury could find that the Modesto Police

9    Department did not have in place a written policy on the necessary and appropriate use of a dog.

10         Defendants contend that the bite occurred during Stryker's assisting Ulrich in the

11   apprehension of a suspect where he had a reasonable suspicion of the suspect's involvement in

12   criminal activity.  Plaintiff contends that he was not the actual suspect and it is a question of fact

13   whether Ulrich had reasonable suspicion that Plaintiff was the suspect sought. Reasonable

14   suspicion is a standard lesser than probable cause. It is defined as "a particularized and objective

15   basis for suspecting the particular person stopped of criminal activity." United States v. Valdes-

16   Vega, 738 F.3d 1074, 1078 (9th Cir. 2013).

17         Defendants provide particularized and objective facts indicating that the bite occurred

18   while the dog was assisting Ulrich, an employee of the Modesto Police Department, in the

19   apprehension of a suspect. The undisputed facts show that Ulrich had reasonable suspicion of the

20   suspect's involvement in criminal activity. Defendants indicate the suspect Zephier was reported

21   for criminal activity and fled when police arrived, and that Ulrich was attempting to apprehend

22   Zephier when he commanded Stryker to bite Plaintiff. Further, Defendants provide articulable and

23   objective facts supporting Ulrich's reasonable suspicion that Plaintiff was the suspect –the suspect

24   was announced to be at large, Plaintiff was in the search area, a jacket like the suspect's was found

25   under the fence of the property, and Plaintiff did not comply with the officers' several loud

26   requests that he reveal himself. These facts meet the lesser standard of reasonable suspicion.

27         No reasonable jury could find that Stryker was not a dog used in police work assisting

28

---

[7] This finding does not prejudice any parties' challenge to this document at trial or a motion in limine.

Ulrich in apprehending Plaintiff. Ulrich had a reasonable suspicion that Plaintiff was the suspect involved in criminal activity. Hence, there is no genuine dispute that an action against Defendants may not be brought under this statute. Defendants' motion for summary judgment on Plaintiff's section 3342 claim will be granted.

## VIII.   CONCLUSION AND ORDER

THEREFORE, in accord with the forgoing discussion, it is hereby ORDERED that;

1. Defendants' motion for summary judgment is GRANTED on Plaintiff's Section 1983 claims based on the Fourteenth Amendment, and based on the Fourth Amendment prohibition of unreasonable searches;

2.  Defendants' motion for summary judgment is GRANTED on Plaintiff's Cal. Civ. Code section 3342 claim; and

3. Defendants' motion for summary judgment is DENIED ON ALL OTHER CLAIMS.

IT IS SO ORDERED.

Dated:   August 6, 2014      _____

SENIOR  DISTRICT  JUDGE